UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SUNNY R. WALKER,

                          Plaintiff          DECISION AND ORDER

-vs-

                                       1:18-CV-01268 CJS

ANDREW M. SAUL,
Commissioner of Social Security,

                          Defendant.
_____


APPEARANCES

For the Plaintiff:                Felice A. Brodsky
                                           556 South Transit Road
                                           P.O. Box 557
                                           Lockport, New York 14095

                                           James P. Ratchford
                                           1231 Delaware Avenue, Suite 103
                                           Buffalo, New York 14209

For the Defendant:             Sixtina Fernandez
                                           Social Security Administration
                                           Office of General Counsel
                                           26 Federal Plaza, Room 3904
                                           New York, New York 10278

                                           Anne M. Zeigler
                                           Dennis J. Canning
                                           Social Security Administration
                                           Office of General Counsel
                                           601 E. 12th Street, Room 965
                                           Kansas City, Missouri 64106


INTRODUCTION

     This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"), which

denied the application of Sunny Rose Walker ("Plaintiff") for Social Security Supplemental Security Income ("SSI") benefits. Now before the Court is Plaintiff's motion (ECF No. 13) for judgment on the pleadings and Defendant's cross-motion (ECF No. 16) for the same relief. For the reasons discussed below, Plaintiff's application is denied, Defendant's application is granted, and this action is dismissed.

## FACTUAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. The Court will summarize the record only as necessary for purposes of this Decision and Order.

On January 15, 2015, Plaintiff applied for SSI benefits, claiming that she became unable to work on January 21, 2009. (Record[1] ("R.") 96–97).[2] When she applied for benefits, Plaintiff was 32 years of age and had completed high school and two years of college. (R. 96, 191). Plaintiff has no substantial work history, having reportedly worked only during 1999–2002 and 2007–2009, having never earned more than four thousand dollars in any year, and having average annual earnings of just $1,412.00. (R. 176, 182, 198 & 263).[3] Plaintiff resides with her daughter and is the child's sole caretaker, though she indicates that her boyfriend occasionally cooks meals. Plaintiff's marital status is widowed. (R. 41).

---

[1] All references to the Record are to the Administrative Record.
[2] Plaintiff had previously applied-for and been denied disability benefits. (R. 97, 186).
[3] Plaintiff indicates that she is also known as Sunny Rose Halecki. (R.189, 224). Plaintiff also told one treatment provider that she was listed on the entertainment website "IMDb page" as a "costume designer." (R. 402). And, indeed, the IMDb website indicates that Plaintiff (Sunny Halecki) has worked on several films, namely, 2010's "Slime City Massacre (costume designer), 2015's "Killer Rack" (costume designer) and 2016's "Model Hunger" (costume and wardrobe). Relatedly, using the name Sunny Halecki-Walker, Plaintiff also evidently holds herself out on various social media platforms (Linkedin, Twitter, Pinterest) as a self-employed business owner, clothing and jewelry designer, wardrobe stylist, costume designer, art director and personal shopper. However, none of that work activity was disclosed to the Commissioner.

2

At the time of her application, Plaintiff claimed to be disabled due to "fibromyalgia," "GAD," "PTSD,"[4] "ADHD," "agoraphobia," "bipolar disorder," "chronic migraines," "herniated discs," "IBS," "insomnia," "allergies/sinus," and "anxiety." (R. 96-97). In addition, the record indicates that Plaintiff has an "extensive" underlying history of drug usage, characterized by past long-term recreational use of all drugs except "crack" and "PCP," addiction to prescription opiates, repeated requests for narcotic pain medications from medical providers[5] and ongoing use of marijuana[6] Plaintiff has reportedly made inconsistent statements to treatment providers about her drug usage.[7]

In connection with Plaintiff's application for SSI benefits, on April 14, 2015, the Commissioner had Plaintiff examined by a consultative psychologist, Susan Santarpia, Ph.D. ("Santarpia"). Santarpia indicated that Plaintiff had previously been diagnosed with "ADHD, bipolar disorder, generalized anxiety disorder [and] PTSD. (423). Santarpia's examination

---

[4] Plaintiff indicates that her PTSD is related to domestic abuse, and she told one mental health treatment provider that prior to her husband's death he had been serving a prison sentence for "spousal abuse" against her. However, Plaintiff previously told other mental health counselors that her husband had been serving a life sentence in prison for drug trafficking.

[5] *See*, Transcript (R. 209, 264, 307, 309, 311, 319, 366, 370, 384, 396, 402, 461, 464, 466, 471, 475-476, 524, 528, 538, 565). One doctor declined to prescribe Plaintiff medications after she tested positive for use of unprescribed morphine and Tramadol. (R. 309-310) ("I will not prescribe her oxycodone or any other medication for headache."). Another doctor reduced Plaintiff's prescription of Xanax after learning that she was "regularly" using marijuana. (R. 458) On another occasion an emergency room doctor declined to prescribe Plaintiff medication for headaches after observing that her behavior was inconsistent with her complaints of pain and that her statements about her current medications was incorrect. (R. 528) ("NYS narcotic prescription monitoring checked, inconsistent with pt's statement of taking meds").

[6] Plaintiff reportedly told her mental health counselor that she was going to stop using marijuana in preparation for her "SSI" hearing. (R. 633) ("SSI hrg within the next 9 months, has to be absti[n]ent.").

[7] For example, Plaintiff reportedly told a consultative psychologist about her past opiate addiction, but evidently did not disclose her ongoing use of marijuana. (R. 424). Similarly, Plaintiff reportedly told a treating neurologist (R. 435) and the consultative internal medicine examiner (R. 429) that she did not use street drugs. Plaintiff also reportedly misstated her history of long-term cigarette smoking and drug usage to her rheumatologist. (R. 536, 539, 554). In particular, although Plaintiff told her ear, nose and throat doctor that she had smoked one pack of cigarettes per day for sixteen years (R. 559) and had seen a doctor for smoking cessation treatment (R. 557), she reportedly told her rheumatologist that she had "never smoked before." (R. 536, 539).

3

revealed essentially normal findings, with full affect, euthymic mood, intact memory, intact attention and concentration, average cognition, fair insight and fair judgment. (R. 425). Santarpia's medical source statement was as follows:

> She presents as able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, make appropriate decisions, relate adequately with others, and appropriately deal with stress within normal limits. Mild impairment is demonstrated in performing complex tasks independently. Difficulties caused by lack of motivation.
>
> The results of the present evaluation appear to be consistent with psychiatric problems and substance abuse history, but in and of itself does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

(R. 426).

Also, on April 14, 2015, the Commissioner had Plaintiff examined by a consultative internist, John Schwab, D.O. ("Schwab"). Plaintiff reportedly told Schwab that her chief complaints were "fibromyalgia since 2007," and a "herniated disc" in her neck, with pain radiating into her arms and hands. (R. 428). Plaintiff also indicated that she had "chronic migraines," for which medication was not helpful. *Id.* The results of Schwab's examination of Plaintiff were unremarkable "with the exception of some loss of cervical motion."[8] Schwab reported normal neurologic findings and full strength in all extremities. (R. 430). Schwab also obtained an x-ray of Plaintiff's lumbar spine, which was "negative." *Id.*[9] Schwab's medical source statement was brief and direct: "No restrictions based on the findings of

---

[8] ALJ Decision (R. 17).
[9] Plaintiff chides Schwab for ordering a lumbar-spine x-ray when she only complained of diagnosed cervical pain. *See*, Pl. Mem. of Law [#13-1] at p. 6, n 3, 13. However, the Court finds that criticism disingenuous since the record contains numerous complaints by Plaintiff about lumbar pain in addition to cervical pain. (R. 436, 441, 500, 596, 598, 607).

today's examination." (R. 431 & 432).

On May 8, 2015, Social Security medical consultant "M. Marks" ("Marks") indicated that "psychiatrically speaking [the claimant's] condition is considered to be non-severe." (R. 443).

On the other hand, on March 3, 2017, mental health therapist Sheryl Campbell-Julien, R.N. PMHNP ("Campbell-Julien"), who had been treating Plaintiff for approximately one year, completed a mental health impairment questionnaire indicating essentially that Plaintiff was completely unable to work. (R. 623–628).[10] For instance, Campbell-Julien stated that Plaintiff had "poor or no" ability to understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention, maintain regular attendance, work in proximity to others without being distracted, complete a normal workday without interruption from psychologically-based symptoms and perform at a consistent pace. (R. 625–626). Additionally, Campbell-Julien asserted that Plaintiff had "extreme" limitations in activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace. (R. 627). Campbell-Julien further stated that Plaintiff's impairments would cause her to miss work "more than three times a month." (R. 625).

After Plaintiff's SSI claim was denied initially, on May 2, 2017, she and her attorney appeared for a hearing before an Administrative Law Judge ("ALJ"). The ALJ took testimony from Plaintiff and a vocational expert ("VE").

---

[10] On December 19, 2012, Plaintiff told her previous mental health therapist Gloria White ("White") that she was thinking of applying for disability because she couldn't work. White indicated in her notes that Plaintiff wasn't disabled due to mental health problems but might be for medical problems. (R. 419)

On August 2, 2017, the ALJ issued a Decision denying Plaintiff's claim. (R. 10–23). Following the familiar five-step sequential analysis used to evaluate Social Security disability claims,[11] the ALJ made these findings at the first three steps: 1) Plaintiff had not engaged in substantial gainful activity since the application date, January 15, 2015; 2) Plaintiff had severe impairments consisting of chronic neck pain, migraine headaches, anxiety, bipolar disorder, post-traumatic stress disorder and attention deficit disorder, and non-severe impairments consisting of gastroesophageal reflux disorder ("GERD") and poly-arthritis; and 3) Plaintiff's impairments either singly or in combination did not meet or medically equal a listed impairment. When considering whether Plaintiff's mental impairments satisfied either Listing 12.04 (affective disorders) or 12.06 (anxiety disorders) the ALJ found, contrary to what Campbell-Julien had indicated, that Plaintiff's symptoms did not satisfy the "paragraph B" criteria (requiring at least one extreme limitation or two marked limitations in a broad area of functioning), since her limitations were only "moderate" at most. (R. 13–14). In so finding, the ALJ observed that the medical evidence indicated that Plaintiff had little if any limitation under Paragraph B.[12] Nevertheless, the ALJ primarily focused on Plaintiff's own subjective statements at this step of the evaluation when finding that Plaintiff's limitations in the Paragraph B criteria were no worse than moderate. (R. 13–14).

---

[11] *See, Bowen v. City of New York*, 476 U.S. 467, 470, 106 S. Ct. 2022, 2025, 90 L. Ed. 2d 462 (1986) ("Pursuant to statutory authority, the Secretary of Health and Human Services has adopted complex regulations governing eligibility for SSD and SSI payments. 20 CFR pt. 404, subpart P (1985) (SSD); 20 CFR pt. 404, pt. 416, subpart I (1985) (SSI). The regulations for both programs are essentially the same and establish a five-step "sequential evaluation" process.").

[12] *See*, ALJ Decision at R. 13-14 ("[F]indings as to her cognition on mental status examinations have generally been normal . . . and on treating source examination her attention was generally normal or no worse than fair.").

6

Prior to reaching the fourth step of the sequential evaluation, the ALJ found that Plaintiff had the following residual functional capacity ("RFC"):

> [C]laimant has the [RFC] to perform light work as defined in 20 CFR 416.967(b), including lifting, carrying, pushing and pulling up to ten pounds frequently and twenty pounds occasionally, sitting for up to a total of six hours, standing for up to a total of six hours, and walking for up to a total of six hours, except; the claimant's ability to understand, remember and carry out instructions is limited to performing simple, routine and repetitive tasks; the claimant's ability to use judgment is limited to simple work-related decisions; the claimant can occasionally respond appropriately to supervisors, coworkers and the public; and the claimant's ability to deal with changes in the work setting is limited to simple work-related decisions.

(R. 14). In reaching that conclusion, the ALJ first reviewed the record and concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of her symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (R. 20). In particular, the ALJ indicated that Plaintiff's statements were inconsistent with the "physical and mental findings on clinical examinations" which were largely unremarkable and showed that she had full strength, "the objective diagnostic test evidence" which showed only mild problems, Plaintiff's pursuit of only conservative treatment, and Plaintiff's statements concerning her daily activities which included caring for her daughter and going to a gym regularly. (R. 20).

With respect to the medical opinion evidence, the ALJ identified four opinions: 1) the consultative psychological report by Santarpia; 2) the consultative medical report by Schwab; 3) the report by non-examining agency psychological consultant Marks; and 4) the psychological questionnaire from Campbell-Julien. The ALJ assigned "great weight" to Santarpia's opinion, remarking that it "reported objective findings and opinions [that were]

7

consistent with the record as a whole in that they reflect[ed] the mild nature of the claimant's symptoms." (R. 20). However, the ALJ assigned only "little weight" to the opinion of agency physician Marks that Plaintiff had no severe mental impairments, stating that "the record as a whole, including evidence subsequent to the consultant's review, does establish that the claimant's mental impairments, while not disabling, do result in significant work-related functional limitations." (R. 21). Similarly, the ALJ assigned only "partial weight" to Schwab's consultative opinion that Plaintiff had no functional physical limitations, indicating that it was not entirely consistent with the rest of the record. (R. 21). On this point the ALJ stated, "The record contains objective findings that are at least in part consistent with the claimant's physical complaints, and so Dr. Schwab's conclusion that the claimant has no restrictions is not reflective of the medical records." *Id.* Finally, the ALJ gave "little weight" to the opinion of Campbell-Julien, stating that "the extreme findings indicated [by Campbell-Julien] are not consistent with the medical record. . . . [T]he claimant's mental health examinations contained few substantial findings, with most categories noted to be normal or near normal." *Id.* In this regard, the ALJ observed, with regard to Plaintiff's mental health treatment notes, that

> findings on mental status examination were almost entirely benign, including a well-groomed appearance, euthymic mood, appropriate affect, normal speech, logical, linear and goal directed thought processes, and normal perceptions without delusions. The claimant's concentration, insight and judgment were rated as fair. Subjectively, the claimant acknowledged that [her medications helped with mood instability and anxiety]. [Even after a new treatment provider diagnosed her with ADHD, generalized anxiety disorder and PTSD, in addition to opioid use disorder,] [f]indings on mental status examinations continued to show few substantial findings.

(R. 18). The ALJ concluded his discussion of the opinion evidence by stating: "In sum, the

8

[RFC] assessment is supported by the objective medical evidence on clinical examination and diagnostic testing, the nature of the treatment the claimant has sought and required, the opinion of an examining source, and, to some extent, the claimant's statements as to her functioning." (R. 21).

At step four of the sequential evaluation the ALJ found that Plaintiff had no past relevant work. (R. 22). However, at step five the ALJ found, based upon testimony from the VE, that there were several light unskilled jobs in the national economy that Plaintiff could perform, namely, housekeeper, folder and router. *Id.* Consequently, the ALJ concluded that Plaintiff was not disabled at any time between her application date and the date of his decision. (R. 22–23).

Plaintiff appealed but on September 12, 2018, the Appeals Council declined to review the ALJ's decision, making that decision the Commissioner's final decision on Plaintiff's application.

On November 11, 2018, Plaintiff commenced this action, and on September 11, 2019, she filed the subject motion (ECF No. 13) for judgment on the pleadings. Plaintiff advances two main arguments: The ALJ improperly substituted his own medical judgment for competent medical opinion, and interpreted raw medical data to make the RFC finding; and, the ALJ failed at step 3 of the sequential evaluation to properly consider Listing 12.04.

With respect to the first argument, Plaintiff contends that the ALJ did not base the RFC's physical restrictions on any competent medical opinion, since Schwab's conclusion was the only medical opinion concerning Plaintiff's physical abilities and the ALJ essentially rejected that opinion as being inconsistent with the record as a whole. Moreover, despite Schwab's indication that Plaintiff had no physical restrictions, the ALJ found that Plaintiff had physical

9

restrictions, based on his own interpretation of the medical evidence and Plaintiff's statements. Plaintiff maintains that when the ALJ rejected Schwab's opinion he created an "evidentiary gap" in the record that required him to obtain additional medical opinion evidence, but that instead, the ALJ erroneously interpreted the medical evidence himself.

With regard to Plaintiff's mental impairments, Plaintiff similarly maintains that the ALJ failed to rely on competent medical opinion when making the RFC determination even though the ALJ purportedly gave great weight to Santarpia's opinion. Plaintiff begins by observing that the ALJ rejected the opinion of Plaintiff's treating therapist, Campbell-Julien, as well as the opinion of agency physician Dr. Marks. Those two opinions were diametrically opposed, with Campbell-Julien indicating that Plaintiff had extreme limitations and Marks indicating that Plaintiff's limitations were not even severe. Plaintiff contends, however, that Marks' opinion was essentially the same as Santarpia's opinion, and that even though the ALJ claimed to give great weight to Santarpia's opinion he placed restrictions in the RFC that were more restrictive than those identified by Santarpia. Plaintiff therefore maintains that the ALJ actually rejected all of the medical opinion evidence concerning Plaintiff's mental health conditions and again relied on his own interpretation of the medical evidence to make the RFC determination. Plaintiff contends that by rejecting the opinions of Cambell-Julien, Marks and Santarpia, the ALJ created another "evidentiary gap" that he should have filled by obtaining additional medical evidence, but that instead the ALJ relied on his own interpretation of the medical evidence to make the RFC finding. Plaintiff asserts that remand is required to address these errors by the ALJ.

With respect to Plaintiff's second argument, she contends that the ALJ did not properly assess her limitations at step 3, when considering whether Plaintiff met the requirements of

Listing 12.04 (bipolar disorder), since the ALJ's findings at step three are inconsistent with his findings in the RFC. Specifically, when considering the "paragraph B" factors under Listing 12.04, the ALJ found that Plaintiff had only "mild" and "moderate" limitations, as opposed to either "extreme" or "marked" limitations. Plaintiff contends, though, that the non-exertional limitations in the RFC finding are more than "moderate," and are at least "marked," which suggests that she should have met the "paragraph B" criteria under Listing 12.04 if the ALJ was being consistent. Plaintiff further contends that the ALJ's finding at step 3 was erroneous in any event, since it was not based on medical opinion evidence, since, as already mentioned, the ALJ rejected the opinions by Campbell-Julien and Marks, and the opinion from Santarpia did not include "moderate" limitations on the "paragraph B" criteria. Plaintiff therefore maintains that the ALJ necessarily must have found "moderate" limitations at step 3 based on his own interpretation of the medical evidence, when instead he should have developed the record to fill the "evidentiary gap" created when he essentially rejected all the medical opinion evidence pertaining to Plaintiff's mental limitations.

On November 12, 2019, Defendant filed the subject cross-motion (ECF No 16) for judgment on the pleadings. On December 3, 2019, Plaintiff filed a reply. (ECF No. 17.)

As discussed more fully below, the Court has considered the parties' submissions and the entire record.

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."

11

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered. *Id.*

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

<u>The RFC Finding Concerning Plaintiff's Physical Limitations
is Supported by Substantial Evidence, and the ALJ Did Not Err By
Failing to Obtain Additional Medical Opinion Evidence</u>

Plaintiff contends that the ALJ's finding that she can perform the exertional requirements of light work is not supported by substantial evidence, since the ALJ effectively rejected Schwab's consultative opinion, which was the only medical opinion that purported to assess Plaintiff's physical abilities. Plaintiff maintains that by rejecting Schwab's opinion the

ALJ created an evidentiary gap that he should have filled by obtaining additional medical opinion evidence, rather than by making a determination based on his own unqualified review of the medical evidence. In response, Defendant acknowledges that the ALJ's RFC finding indicated that Plaintiff is capable of performing the exertional demands of light work, which involve "lifting, carrying, pushing, and pulling up to 10 pounds frequently and 20 pounds occasionally, sitting for up to 6 hours total, standing for up to 6 hours total, and walking up to 6 hours total."[13] Further, Defendant concedes that the physical aspect of the RFC finding is not based on medical opinion evidence. However, Defendant argues that "medical authority is not required for an ALJ to assess a claimant's RFC," and that here, "the record as a whole supported the ALJ's RFC finding despite the absence of medical opinion evidence expressly supporting that determination."[14] On this point, Defendant cites *Monroe v. Comm. of Soc. Sec.*, 676 F.App'x 5, 8 (2d Cir. 2017) and *Pellam v. Astrue*, 508 F.App'x 87, 90 (2d Cir. 2013). Further, Defendant contends that the ALJ did not create an evidentiary gap by rejecting Schwab's opinion, since the record as a whole provided sufficient evidence for the ALJ to make his RFC finding. As to this position, Defendant cites *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996).

Preliminarily, the Court observes that it was error for the ALJ to reject Schwab's opinion, since by doing so he arbitrarily substituted his own judgment for competent medical opinion. In this regard, it is well settled that " the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion," and that "[w]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions,

---

[13] Def. Mem. of Law [#16-1] at p. 18.
[14] Def. Mem. of Law [#16-1] at pp. 18, 21.

he is not free to set his own expertise against that of a physician who testified before him." *McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983) (citations omitted). It is also well settled that when, as here, "a medical opinion stands uncontradicted, a circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome it." *Giddings v. Astrue*, 333 Fed.Appx. 649, 652 (2d Cir. Jun. 26, 2009) (citations and internal quotation marks omitted). Here, the ALJ did not provide an overwhelmingly compelling critique of Schwab's opinion, but rather, merely stated that "[t]he record contains objective findings that are at least in part consistent with the claimant's physical complaints, and so Dr. Schwab's conclusion that the claimant has no restrictions is not reflective of the medical records." (R. 21). However, the ALJ did not cite any functional limitations that a doctor had identified as resulting from such "objective findings." Rather, the ALJ simply interpreted raw medical data to find that Plaintiff had greater functional limitations than those identified by Dr. Schwab, without providing the required "overwhelmingly compelling critique" of Schwab's opinion. The ALJ erred in that regard. *See, Riccobono v. Saul,* No. 19-909-CV, 2020 WL 1042221 (2d Cir. Mar. 4, 2020) ("We agree with *Riccobono* that the ALJ failed to meet that high burden when she relied solely on her lay interpretation of the diagnostic tests and other non-medical evidence."). This error, though, benefited Plaintiff since Schwab had indicated that Plaintiff had no physical functional limitations whatsoever.

Nevertheless, Plaintiff contends that by rejecting Schwab's opinion the ALJ created an evidentiary gap in the record, since there was no other medical opinion to support the ALJ's finding that Plaintiff had the physical ability to perform light work. Plaintiff' maintains, therefore, that the RFC finding is unsupported by substantial evidence and that the matter

14

must be remanded for further development of the record. However, the Court disagrees. Contrary to Plaintiff's argument, it is not reversible error for an ALJ to make an RFC finding without the benefit of a medical opinion, provided that the record is otherwise complete and contains other evidence of the claimant's functional abilities. *See, e.g., Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) ("Given the specific facts of this case, including a voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ, we hold that it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity."). Here, the ALJ reviewed the voluminous medical record and noted that the findings from physical examinations by various doctors were essentially normal[15] except for "some loss of cervical motion" (R. 17), "diminished range of motion and weakness in her shoulders" (R. 19), "tenderness to palpation of the cervical and lumbar spine" (R. 19) and "give way weakness in her left upper extremity due to pain." (R. 20). Additionally, the ALJ cited the evidence concerning Plaintiff's physical activities, including Plaintiff's "statements regarding her functioning, including her self-care, meal preparation, light cleaning, shopping trips, role as the primary caregiver for her child, and regular use of a gym"[16] during the period of alleged disability. (R. 20). The Court finds that the RFC finding that Plaintiff can perform the physical requirements of light work is supported by substantial evidence.

<u>The ALJ's RFC Finding Concerning Plaintiff's Non-exertional Limitations is Supported by Substantial Evidence, and the ALJ Did Not Err By Failing to Obtain Additional Opinion Evidence</u>

---

[15] *See, e.g.*, (16) ("Objective findings were entirely benign[.]").
[16] *See*, Def. Mem. of Law [#16-1] at p. 10 ("In May 2016 Plaintiff told her neurologist that her back pain resolved and she started going to the gym five to seven days a week with her mom. (R. 596.) She said she walked on the treadmill, lifted light weights, and worked on her core for about an hour." (R. 596.)

15

Plaintiff further contends that the ALJ rejected all the medical opinion evidence concerning Plaintiff's non-exertional impairments, thereby creating an evidentiary gap in the record, and arbitrarily substituted his own judgment for competent medical opinion. In this regard, Plaintiff maintains that although the ALJ claimed to give great weight to Santarpia's consultative opinion, he really rejected that opinion since his RFC finding included non-exertional limitations that were more restrictive than those identified by Santarpia. Indeed, Plaintiff contends that Santarpia's opinion is indistinguishable from that of Dr. Marks, which the ALJ expressly rejected. Defendant responds, again, that reversal would not necessarily be required even if the ALJ completely rejected all of the medical opinion evidence concerning Plaintiff's non-exertional impairments, since "medical authority is not required for an ALJ to assess a claimant's RFC."[17] Defendant further contends that the record contained sufficient evidence for the ALJ to make his RFC finding, and that the ALJ therefore did not err by failing to develop the record.

The Court again agrees with Defendant and disagrees with Plaintiff. In particular, the Court does not agree with Plaintiff's contention that the ALJ effectively rejected Santarpia's opinion simply because the RFC finding contained some additional limitations not identified by Santarpia. To begin with, the ALJ expressly stated that he was rejecting Marks' opinion but giving great weight to Santarpia's opinion. Further, the non-exertional portion of the RFC finding was largely consistent with Santarpia's opinion. For example, Santarpia opined that Plaintiff was "able to follow and understand simple directions and instructions [and] perform simple tasks independently," but that she would have a mild impairment performing complex

---

[17] Def. Mem. of Law [#16-1] at p. 18.

tasks independently. Similarly, the RFC finding indicated that Plaintiff was "limited to performing simple, routine and repetitive tasks," and to making "simple work related decisions." (R. 14). Accordingly, the ALJ did not reject Santarpia's opinion. *See, Pellam v. Astrue*, 508 Fed.Appx. 87, 90 (2d Cir. Jan. 28, 2013) (ALJ did not reject medical opinion, where the RFC determination was ultimately consistent with that opinion). By contrast, Marks had opined that Plaintiff's non-exertional impairments were non-severe, therefore his opinion was not identical to Santarpia's opinion.

For these same reasons the Court does not agree with Plaintiff that the ALJ created an evidentiary gap in the record by rejecting all medical opinions concerning Plaintiff's non-exertional impairments, or that the ALJ should have developed the record further. Plaintiff correctly observes that the ALJ included some additional non-exertional limitations in the RFC that were not included in Santarpia's opinion. For example, the ALJ limited Plaintiff's contact with co-workers, supervisors and the public (evidently based on Plaintiff's assertion that she does not like to interact with people) while Santarpia indicated that Plaintiff "can relate adequately with others." (R. 15, 426). However, an ALJ is entitled to make an RFC finding that is consistent with the record as a whole, even if it does not perfectly match a particular medical opinion. *See*, *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (Rejecting argument that ALJ had improperly substituted his medical judgment for ex pert opinion, stating that: "Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."); *see also, Camille v. Colvin*, 652 F. App'x 25, 29 n. 5 (2d Cir. 2016) ("The ALJ used Dr. Kamin's opinion as the basis for the RFC but incorporated additional limitations based on*, inter alia*, the testimony of Camille

17

that she credited. An ALJ may accept parts of a doctor's opinion and reject others.") (citations omitted).

### The ALJ's Findings at Step Three of the Sequential Evaluation Were Not Inconsistent With the RFC Finding

Lastly, Plaintiff contends that the ALJ did not properly assess her limitations at step 3, when considering whether she met the requirements of Listing 12.04 (bipolar disorder), since the ALJ's findings at step three are inconsistent with his findings in the RFC. Specifically, when considering the "paragraph B" factors under Listing 12.04, the ALJ found that Plaintiff had only "mild" and "moderate" limitations, as opposed to either "marked" or "extreme" limitations, in the areas of "understanding, remembering or applying information," "interacting with others," and "concentrating, persisting or maintaining pace."(R. 13–14). Plaintiff contends, though, that the non-exertional limitations in the RFC finding are more than "moderate," and are at least "marked," which means that she should have met the "paragraph B" criteria under Listing 12.04 if the ALJ was being consistent. Defendant responds that Plaintiff's argument lacks merit since "the ALJ's RFC limitations were consistent with his step three findings of 'moderate' limitations in the paragraph B criteria of Listing 12.04."[18]

Again, the Court finds that Plaintiff's argument lacks merit. The RFC finding indicated that Plaintiff could perform "simple, routine and repetitive tasks," could use her judgment to make "simple work-related decisions," and could "occasionally respond appropriately to supervisors, coworkers and the public." (R. 14). The Court does not agree that these RFC restrictions necessarily translate into "marked" or "extreme" limitations under Listing 12.04's

---

[18] Def. Mem. of Law [#16-1] at p. 22.

paragraph B criteria in the areas of "understanding, remembering or applying information," "interacting with others," and "concentrating, persisting or maintaining pace. Moreover, the ALJ's step 3 finding (that Plaintiff had less than "marked" or "extreme" limitations in those areas) is supported by substantial evidence.

Plaintiff further contends that the ALJ's finding at step 3 was erroneous in any event, since it was not based on medical opinion evidence, as Santarpia's opinion would support only less-than-"moderate" limitations on the "paragraph B" criteria. Plaintiff therefore contends that the ALJ necessarily must have found "moderate" limitations at step 3 based on his own interpretation of the medical evidence, when instead he should have developed the record to fill the "evidentiary gap" created when he essentially rejected all of the medical opinion evidence pertaining to Plaintiff's mental limitations. However, the Court has already found that the ALJ did not reject all of the medical opinion evidence, and that the ALJ's findings, under Listing 12.04's paragraph B, are supported by substantial evidence.

## CONCLUSION

Plaintiff's motion for judgment on the pleadings (ECF No. 13) is denied, Defendant's cross-motion (ECF No. 16) for the same relief is granted, and this action is dismissed. The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
March 25, 2020

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge